IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| THE BABYLON BEE, LLC and DAWN O'BRIEN, <br><br> Plaintiffs, <br><br> v. <br><br> (caption continued) <br> ANNE E. LOPEZ, in her official capacity as Attorney General of Hawaii; DAVID CHEE, in his official capacity as Chair of the Campaign Spending Commission; NEAL HERBERT, in his official capacity as Vice Chair of the Campaign Spending Commission; JON ITOMURA, in his official capacity as member of the Campaign Spending Commission; BARBARA POLK, in her official capacity as member of the Campaign Spending Commission; DANTON WONG, in his official capacity as member of the Campaign Spending Commission; STEVEN S. ALM, in his official capacity as Prosecuting Attorney for the City and County of Honolulu, <br><br> Defendants. | CASE NO. CV 25-00234-SASP-KJM <br><br> **DEFENDANTS ANNE E. LOPEZ, DAVID CHEE, NEAL HERBERT, JON ITOMURA, BARBARA POLK, and DANTON WONG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

**STATE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' <u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................1

II.   FACTUAL BACKGROUND ........................................................................2

      A.    Political Deepfakes.............................................................................2

      B.    Act 191 .................................................................................................3

III.  LEGAL STANDARD ....................................................................................4

IV.   ARGUMENT..................................................................................................4

      A.    Plaintiffs lack standing because they have not alleged any
            imminent violation of Act 191 ...............................................................4

            1.    Act 191 regulates only "advertisements"....................................5

            2.    Act 191 does not prohibit satire or parody ..................................6

            3.    Act 191 does not cover Plaintiffs' conduct ..................................3

            4.    Act 191 has not chilled Plaintiffs' conduct ...............................11

      B.    Act 191 is Valid Under the First Amendment .....................................11

            1.    Act 191 is not facially invalid or overbroad under
                  the First Amendment..................................................................11

                  i.     Act 191 contains important limitations to its
                         scope ...............................................................................12

                  ii.    Act 191's potential applications are
                         constitutional...................................................................13

            2.    Act 191 is not invalid as applied................................................16

                  i.     Act 191 is non-viewpoint discriminatory ......................16

i

ii.    Act 191 furthers compelling interests in
electoral integrity ............................................................17

iii.    Act 191 is narrowly tailored ...........................................18

iv.    Act 191's labelling safe harbor is valid .........................21

C.    Act 191 is Not Unconstitutionally Vague.............................................23

V.    CONCLUSION...............................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Animal Legal Def. Fund v. Wasden,*
  878 F.3d 1184 (9th Cir. 2018) .............................................................................14

*Boyer v. City of Simi Valley,*
  978 F.3d 618 (9th Cir. 2020) ..............................................................................17

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ..................................................................................................6

*Burson v. Freeman,*
  504 U.S. 191 (1992) ...................................................................................... 18, 19

*California Pro-Life Council, Inc. v. Getman,*
  328 F.3d 1088 (9th Cir. 2003) ..............................................................................5

*Eu v. San Francisco Cnty. Democratic Cent. Comm.,*
  489 U.S. 214 (1989) .............................................................................................18

*Farah v. Esquire* Magazine,
  736 F.3d 528 (D.C. Cir. 2013) ............................................................................10

*Fed. Election Comm'n v. Wisconsin Right to Life, Inc.,*
  551 U.S. 449 (2007) ...........................................................................................6, 8

*Freedom to Travel Campaign v. Newcomb,*
  82 F.3d 1431 (9th Cir. 1996) ..............................................................................25

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ...................................................................................... 24, 26

*Hill v. Colorado,*
  530 U.S. 703 (2000) .............................................................................................26

*Kohls v. Bonta,*
  No. 2:24-cv-2527-JAM-CKD, 2025 WL 2495613 (E.D. Cal. Aug
  29, 2025) ...................................................................................... 15, 18, 22

*Kohls v. Ellison,*
   No. 24-CV-3754 (LMP/DLM), 2025 WL 66765 (D. Minn. Jan. 10,
   2025) ........................................................................................................7, 9

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ................................................................................26

*Laird v. Tatum,*
   408 U.S. 1 (1972) ....................................................................................11

*Lopez c. Candaele,*
   630 F.3d 775 (9th Cir. 2010) ....................................................... 5, 8, 11

*McIntyre v. Ohio Elections Comm'n,*
   514 U.S. 334 (1995) ................................................................................18

*Menotti v. City of Seattle,*
   409 F.3d 1113 (9th Cir. 2005) ................................................................18

*Milkovich v. Lorain Journal Co.,*
   497 U.S. 1 (1990) ......................................................................... 7, 14, 24

*Moody v. NetChoice LLC,*
   603 U.S. 707 (2024). ...............................................................................12

*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998) ...................................................................... 12, 14-15

*Project Veritas v. Schmidt,*
   125 F.4th 929 (2025) ...............................................................................14

*Reno v. Am. Civil Liberties Union,*
   521 U.S. 844 (1997) ................................................................................19

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
   515 U.S. 819 (1995) ................................................................................16

*Smith v. Helzer,*
   95 F.4th 1207 (9th Cir.) ................................................................. 21, 23

*Socialist Workers Party v. March Fong Eu,*
   591 F.2d 1252 (9th Cir. 1978) ................................................................14

*Thomas v. Anchorage Equal Rights Com'n*,
  220 F.3d 1134 (9th Cir. 2000) ................................................................. 5, 8, 11

*United Public Workers of America (C.I.O.) v. Mitchell*,
  330 U.S. 75 (1947) .......................................................................................9

*United States v. Alvarez*,
  567 U.S. 709 (2012) ........................................................... 13, 15, 20, 24

*United States v. Jae Gab Kim*,
  449 F.3d 933 (9th Cir. 2006) ......................................................... 24-25

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ...................................................................................24

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) ................................................................... 16, 20

*Yamada v. Snipes*,
  786 F.3d 1182 (9th Cir. 2015) ......................................................... 6, 24

*Yamada v. Weaver*,
  872 F.Supp.2d 1023 (D. Haw. 2012) ............................................... 5-6

## Statutes and Legislative History

HRS § 11-302 ......................................................................... 5-6, 20, 25

HRS § 11-303 ............................................................................... 17, 20

HRS § 11-303(a) ................................................................... 3-4, 13, 15

HRS § 303(b) .............................................................................................4

HRS § 11-303(c) ............................................................................... 4, 21

HRS § 11-303(d) .......................................................................................4

HRS § 11-303(h) ..................................................................... 5, 7, 10

HRS § 11-303(h)(3) .................................................................................22

Act 191 (2024) ............................................................................... *passim*

Cal. Elec. Code § 20012(b)(1) ....................................................................15

Cal. Elec. Code §§ 20012(b)(1)(A)-(C) ....................................................15

Cal. Elec. Code § 20012(b)(1)(B) ..............................................................15

Cal. Elec. Code § 20012(b)(1)(D) ..............................................................15

Cal. Elec. Code § 20012(b)(3) ....................................................................15

Cal. Elec. Code § 20012(f)(8) .....................................................................22

Minn. Stat. § 609.771, subd. 1(c)(1) ............................................................9

**Rules**

Fed. R. Civ. P. 56(a) .....................................................................................4

# I.    INTRODUCTION

Motivated by the ever-increasing threat that digitally-produced misinformation poses to the integrity of our elections, the Hawaiʻi Legislature passed Act 191 in 2024. It restricts, during the months before a general election, the distribution of "materially deceptive media."

Act 191 mitigates the threat of harm to candidates and voters posed by "political deepfakes." It is narrow, targeting only the conduct most likely to cause harm. It restricts only digitally- or AI-produced election "advertisements" that depict an individual engaging in conduct they did not engage in, but only if a reasonable viewer or listener would believe that the depiction is genuine, and only if the advertisement is distributed in reckless disregard of the risk of harming an election candidate or changing other voters' voting behavior.

Plaintiffs incorrectly assert that Act 191 violates the First Amendment and is unconstitutionally vague. Most importantly, they dramatically overstate the scope and reach of the Act. They claim that it prohibits satire and parody, and restricts genuine political debate, of which it does neither. In fact, Act 191's scope is so focused that Plaintiffs cannot demonstrate that they have engaged in conduct that would—even if done in the months leading up to an election—violate the law. And because of that, Plaintiffs do not have standing to bring this pre-enforcement challenge.

In any event, Act 191 is not unconstitutional. Its terms are clear and it is narrowly tailored to further the State's compelling interest in preserving electoral integrity. Given the lack of material facts in dispute, the Court should summary award judgment to Defendants on all claims.

## II.    FACTUAL BACKGROUND

### A.    Political Deepfakes

Deepfakes are a form of synthetically altered digital content, including images, videos, and audio, that depict events that did not in fact occur. State's Concise Statement of Facts (SCSF) ¶1. Recent advances in technology, especially artificial intelligence (AI), have made it much easier, quicker, and cheaper to make extremely realistic deepfakes that are very difficult to detect. SCSF ¶¶4-5. The tools to create such media are now widely available, SCSF ¶11, and have been used in recent elections to create misleading deepfakes of candidates saying or doing things they did not say or do. SCSF ¶¶8-10. One database contains over 800 examples of political deepfake incidents, which is likely an underestimate due to the difficulties in identifying political deepfakes. SCSF ¶8.

Research has shown that political deepfakes can manipulate voters to alter decisions on whether to vote and who to vote for, sow confusion, and create mistrust for media and elections. SCSF ¶17. Mitigating the effects of political deepfakes poses particular challenges for state and local governments. SCSF ¶29.

Not only are deepfakes difficult to detect, but they tend to spread quickly—often faster than genuine media—and continue to impact viewers' beliefs even after they learn that the contents are fake. SCSF ¶¶14, 19, 27.

## B.    Act 191

In response, the Hawaiʻi Legislature in 2024 passed SB2687, which was signed into law as Act 191. The Legislature found that "regulating the use of deepfake and generative AI technologies to influence elections is necessary to protect the democratic process in the State." Rayner Decl. Ex. A, p.2. The Act provides that:

> no person shall recklessly distribute, or enter into an agreement with another person to distribute, between the first working day of February in every even-numbered year through the next general election, materially deceptive media in reckless disregard of the risk of harming the reputation or electoral prospects of a candidate in an election or changing the voting behavior of voters in an election.

Haw. Rev. Stat. (HRS) §11-303(a).

"Materially Deceptive Media" (MDM) is defined as:

> any information, including any video, image, or audio, that:
> (1) Is an advertisement;
> (2) Depicts an individual engaging in speech of conduct in which the depicted individual did not in fact engage;
> (3) Would cause a reasonable viewer or listener to believe that the depicted individual engaged in the speech or conduct depicted; and
> (4) Was created by:
>> (A) Generative adversarial network techniques or another technique that translates a source image into

3

another image using machine learning, deep learning
techniques, and convolutional neural networks;
(B) Artificial intelligence; or
(C) Digital Technology.

Absent other aggravating factors, the Act makes violations a petty

misdemeanor, *id.* § 11-303(d), and creates civil remedies for certain plaintiffs, *id.* §

11-304(a)(b). Nevertheless, a party may still distribute MDM if they include a

disclaimer "informing the viewer that the media has been manipulated by technical

means and depicts appearance, speech, or conduct that did not occur." *Id.* § 11-

303(c).

## III.   LEGAL STANDARD

The Court may award summary judgment if there are no genuine material

disputes of fact and the moving party demonstrates it is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a).

## IV.   ARGUMENT

### A.   Plaintiffs lack standing because they have not alleged any imminent violation of Act 191

Plaintiffs must "show an actual or imminent injury to a legally protected

interest," *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010), which, in this pre-

enforcement context, means "a realistic danger of sustaining a direct injury as a

result of the statute's operation or enforcement." *Id.* at 785 (citation omitted). To do

that, Plaintiffs must establish "an intention to engage in a course of conduct . . .

4

proscribed by a statute, and a credible threat of prosecution thereunder." *Id.*

(cleaned up); *see also California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088,

1094 (9th Cir. 2003) (noting that plaintiffs must "articulate[] a 'concrete plan' to

violate the law in question" (quoting *Thomas v. Anchorage Equal Rights Com'n*,

220 F.3d 1134, 1139 (9th Cir. 2000)). A sufficient fear or future prosecution "will

only inure if the plaintiff's intended speech arguably falls within the statute's

reach." *Id.*

Plaintiffs have not established a concrete intent to engage in speech that falls

within Act 191's reach.

### 1.    Act 191 regulates only "advertisements"

Act 191 restricts only "advertisement[s]." HRS § 11-303(h). To be an

"advertisement," a communication must identify a "candidate" that will appear on

the ballot in the next election and "advocate[] or support[] the nomination,

opposition, or election" of that candidate. HRS § 11-302. Importantly, a

"candidate" specifically means a candidate to a "*Hawai'i* elective public or

constitutional office, *excluding . . . federal elective offices*." *Id.* (Emphases added).

The communication must also *plainly* be an appeal to vote for or against the

identified candidate. In *Yamada v. Weaver*, this Court, rejecting a vagueness

challenge to various definitions in HRS § 11-302, including "advertisement,"

interpreted the term as being limited to "communications that expressly advocate

the election or defeat of a clearly identified candidate."[1] *Weaver*, 872 F.Supp.2d

1023, 1054 (D. Haw. 2012) (quoting *Buckley v. Valeo*, 424 U.S. 1, 80 (1976)). The

Court noted that when the definition was enacted, the Hawaiʻi Legislature "was

'mindful of' *Buckley's* 'narrowing construction' and its use of the term 'express

advocacy.'" *Id.* at 1046. Thus, it was "reasonable to infer" that it adopted the

terminology "in reliance on the Supreme Court's interpretation of the same

terminology in federal law." *Id.* That reading is supported by HRS § 11-302's

legislative history. *See* Rayner Decl. Ex. B, p.5.

As the *Weaver* Court also noted, *Buckley's* "express advocacy" holding was

later expanded to include "the functional equivalent of express advocacy," *Fed.*

*Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469 (2007), which

means a communication that "is susceptible of no reasonable interpretation other

than as an appeal to vote for or against a specific candidate." *Id.* at 469-70. Thus,

under HRS § 11-302, a communication is an "advertisement" only if it is

susceptible of no reasonable interpretation other than as an appeal to vote for or

against a specific candidate.

### 2.    Act 191 does not prohibit satire or parody

---

[1] The Ninth Circuit affirmed this Court's on slightly different grounds. *See Yamada v. Snipes*, 786 F.3d 1182, 1192 (9th Cir. 2015). Nevertheless, this Court's decision remains persuasive as to the Hawaiʻi Legislature's intended scope of the term "advertisement."

Satire and parody are forms of speech that "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 2 (1990); *see also Kohls v. Ellison*, No. 24-CV-3754 (LMP/DLM), 2025 WL 66765, at *4 (D. Minn. Jan. 10, 2025) (same). And for media to fall under Act 191, it must "cause a reasonable viewer or listener to believe that the depicted individual engaged in the speech or conduct depicted." HRS § 11-303(h). Thus, just like Minnesota's "political deepfake" law, Act 191 "categorically excludes constitutional parody from its sweep." *Ellison*, 2025 WL 66765, at *4.

### 3.    Act 191 does not cover Plaintiffs' conduct

Plaintiffs have not established any concrete intention to distribute communications that would qualify as MDM under Act 191.

**First**, Plaintiffs have not identified a single communication that would, without more, qualify as an "advertisement." The communications identified by Plaintiff O'Brien either do not identify any candidate for Hawaiʻi office at all, *see* O'Brien Decl., ¶¶17, 19, 20, or do not, as presented, plainly advocate for or against any candidate for Hawaiʻi office, *see id.* ¶¶23,[2] 27, 31.[3] And Babylon Bee has not

---

[2] Although "advertisement" includes communications advocating "the passage or defeat" of a ballot question, a legislative bill—which the image in paragraph 23 of the O'Brien Declaration appears to identify—is not something that appears on a ballot in an election, and thus is not covered by Act 191.

[3] The image in paragraph 31 is inherently ambiguous as to what it is supposed to advocate for or against, if anything. That ambiguity is highlighted by O'Brien's insistence that she has distributed, and intends in the future to distribute, content

provided any content that identifies *any* past or expected future candidate for

*Hawaiʻi office*, let alone content that unambiguously advocates either the election

or opposition of such a candidate. Even of the articles that identify candidates for

*federal* elective offices—which, by definition, Act 191 does not cover—none are

susceptible of "no reasonable interpretation other than as an appeal to vote for or

against a specific candidate." *Wisconsin Right to Life*, 551 U.S. at 470.

Babylon Bee asserts that it "intends to create and post . . . digitally created

satire and parody about politicians . . . who appear on the ballot in Hawaii, that

depict speech or conduct that did not occur and that advocate support or opposition

of the candidate," Dillon Decl., ¶43. But, aside from the fact that Act 191 does not

prohibit "satire and parody," "the Constitution requires something more than a

hypothetical intent to violate the law." *Lopez*, 630 F.3d at 787 (quoting *Thomas*,

220 F.3d at 1139). Instead, plaintiffs must "giv[e] details about their future speech

such as when, to whom, where, or under what circumstances." *Id.* (cleaned up).

Plaintiffs here assert only a "general intent to violate a statute at some unknown

date in the future," which "does not rise to the level of an articulated, concrete

plan." *Thomas*, 220 F.3d at 1139. In short, they do not provide any "details about

their future speech," *Lopez*, 630 F.3d at 787, that are "specific enough so that a

---

"opposing [Governor Josh Green's] candidacy," despite the image in paragraph 31
showing President Donald Trump endorsing Josh Green. Plaintiffs also apparently
recognize that the image's message is ambiguous. Memo at 23.

court need not "speculate as to the kinds of political activity [they] desire to engage in or as to the contents of their . . . statements or the circumstances of their publication." *Id.* (quoting *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 90 (1947)).

**Second**, Babylon Bee intends only to publish satire and parody, which Act 191 does not prohibit. In *Ellison*, the court was faced with this same question. 2025 WL 66765, *4-5. It first concluded that Minnesota's "political deepfake" law, which proscribed only media that "is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct," *id.* at *4 (quoting Minn. Stat. § 609.771, subd. 1(c)(1)), "excludes constitutional parody from its sweep." *Id.* The court then determined that plaintiff Kohls had "only ever posted constitutional parody," some of which was labelled as "PARODY." *Id.* at *5. As such, Kohls had "failed to identify a course of conduct 'arguably proscribed' by the statute," and lacked standing. *Id.*

Like Kohls, Babylon Bee has only published satire or parody. Dillon Decl. ¶¶5, 9, 23, 43, 46-47, 81. And although none of its *individual* articles explicitly indicate that they are parody or satire, Babylon Bee publicly makes it very clear that its articles are satirical. *See* SCSF ¶32; Plaintiffs' Concise Statement of Facts (PCSF) ¶¶1-2.

9

Moreover, neither the fact that one person—Donald Trump—reportedly mistook a single Babylon Bee article for real news, Dillon Decl. ¶52, nor that Babylon Bee's articles have occasionally been "fact-checked," *id*. ¶¶53-60, bring them within Act 191's purview.

As a threshold matter, none of the articles that have been fact-checked or purportedly mistaken as real would qualify as "advertisements" under HRS § 11-302, so they cannot form a basis for standing here. In addition, the relevant standard under Act 191 is *objective*: whether the media in question would "cause a reasonable viewer or listener to believe" that the content is genuine. HRS § 11-303(h); *see also Farah v. Esquire* Magazine, 736 F.3d 528, 537 (D.C. Cir. 2013) ("The test . . . is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be (after time for reflection)."). A single Donald Trump retweet does not establish that "reasonable viewer[s]" would believe the article to be real, particularly when Babylon Bee itself seems aware that Trump knew the article was satire. SCSF ¶36.

Nor can Plaintiffs rely on Snopes and USA Today fact-checks of its articles because neither organization bases decisions to fact check satirical articles on whether a reasonable person would believe them. SCSF ¶¶33-35. Babylon Bee has simply not provided evidence that it has published or intends to publish an article

that would qualify as MDM. It, like O'Brien, has not established an "articulated, concrete plan," *Thomas*, 220 F.3d at 1139, to violate Act 191.

### 4.    Act 191 has not chilled Plaintiffs' conduct

Finally, Plaintiffs cannot claim standing on the grounds that Act 191 chills their speech. O'Brien asserts that she will "refrain from posting" certain content because of Act 191, PCSUF ¶¶39-40, but "self-censorship alone is insufficient to show injury." *Lopez*, 630 F.3d at 792; *see also id.* (the Court's standing analysis "does not turn on the strength of plaintiffs' concerns about a law, but rather on the credibility of the threat that the challenged law will be enforced against them"); *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). As explained above, based on the allegations and evidence presented, O'Brien has not established a concrete intent to violate Act 191, so there is no credible risk of enforcement against her.

Because Plaintiffs have not established that they have standing to challenge Act 191, the Court should enter summary judgment for Defendants.

### B.    Act 191 is Valid Under the First Amendment

Even if Plaintiffs have standing, they are not entitled to judgment because Act 191 does not violate the First Amendment either facially or as applied.

### 1.    Act 191 is not facially invalid or overbroad under the First Amendment

Facial challenges under the First Amendment are "hard to win." *Moody v. NetChoice LLC*, 603 U.S. 707, 723 (2024). They are "strong medicine that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (cleaned up, citation omitted). To prevail, a plaintiff must establish that the "law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724. The Court must therefore first "asses the state law's scope" and determine "[w]hat activities, by what actors, do the laws prohibit or otherwise regulate[,]" then "decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest." *Id.* at 725. Here, Plaintiffs have failed to carry their "heavy burden" to establish that Act 191 is facially invalid. *Finley*, 524 U.S. at 580.

### i. Act 191 contains important limitations to its scope

First, as noted above, Act 191 is limited to situations where parties distribute materially deceptive media to clearly advocate in support of or against a specific candidate for Hawaiʻi elective office or ballot issue. So, it does not cover general commentary on candidates. And it covers only electoral *candidates*, not government officials, because its focus is on protecting the election process. Nor does Act 191 prohibit satire or parody, which appears to be the most significant of

Plaintiffs' objections.[4] On these grounds alone, Plaintiffs' facial challenge should fail.

But Act 191 is even more limited by its scienter requirements. A person can only be liable if they "recklessly distribute, or enter into an agreement to distribute" MDM and does so "in reckless disregard of the risk of harming the reputation or electoral prospects of a candidate in an election or changing the voting behavior of voters in an election." HRS § 11-303(a). This is important because, while "falsity alone may not suffice to bring the speech outside the First Amendment," *United States v. Alvarez*, 567 U.S. 709, 719 (2012), "knowing or reckless falsehood[s]" are not provided the same protection. *Id.*

Finally, most of the time, Act 191 restricts nothing at all. Its restrictions apply only "between the first working day of February in every even-numbered year through the next general election," *id.*; in other words, during the limited period before an election where MDM is most difficult to mitigate through counterspeech. SCSF ¶28.

###     ii.     Act 191's potential applications are constitutional

---

[4] Plaintiffs are entirely wrong, for example, that Act 191 "sweeps up . . .The Bee's articles about President Trump, Vice President Harris, Tim Waltz, and JD Vance," Memo at 21. These articles are plainly satire and reference only candidates for federal elective offices, which Act 191 does not encompass.

Even if Act 191 applied to the occasional attempt at satire, the majority of the speech it covers is unprotected. The Court can therefore reject Plaintiffs' facial/overbreadth challenge without engaging in First Amendment means-ends scrutiny.

For example, the First Amendment does not protect defamatory statements about public figures, on matters of public concern, that are "made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich*, 497 U.S. at 20. Act 191's recklessness requirements are consistent with the standard for defamation, and thus much of what Act 191 restricts would also constitute unprotected defamation.

Additionally, the Ninth Circuit has recognized that "a false statement made in association with a legally cognizable harm or for the purpose of material gain is not protected." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1199 (9th Cir. 2018), *abrogated on other grounds by Project Veritas v. Schmidt*, 125 F.4th 929 (2025). Much of the speech that Act 191 covers can also be regulated under *Wasden* because Act 191 covers MDM distributed with the intent of misleading voters and tricking them into voting for a different candidate, which may implicate the fundamental right to vote. *See Socialist Workers Party v. March Fong Eu*, 591 F.2d 1252, 1260 (9th Cir. 1978).

Even if there are *some* potentially unconstitutional applications of Act 191,

Plaintiffs have not met their heavy burden of establishing that Act 191's

"unconstitutional applications substantially outweigh its constitutional ones."

*Moody*, 603 U.S. at 724.[5] Act 191 does not, as Plaintiffs argue, assume that all

falsehoods are unprotected. It targets only reckless falsehoods, and of those, only

"a subset of lies where" (and when) "specific harm is more likely to occur,"

Alvarez, 567 U.S. at 736 (Breyer, J., concurring).

Plaintiffs also claim that the definition of "advertisement" makes Act 191

overbroad. Memo at 21-22. But that definition substantially *narrows* the Act's

---

[5] Plaintiffs' reliance on the District Court's decision in *Kohls v. Bonta* is
misplaced. On August 29, 2025, the court in that case granted summary judgment
in favor of the plaintiffs. *Kohls v. Bonta*, No. 2:24-cv-2527-JAM-CKD, 2025 WL
2495613 (E.D. Cal. Aug 29, 2025). But the scope of the California law challenged
there, AB 2839, is *far* broader than Act 191. Unlike Act 191, the California law
*does* encompass satire and parody. *See* Cal. Elec. Code § 20012(b)(3) (requiring
"content that constitutes satire or parody" to be accompanied by a disclaimer). And
where Act 191 covers only materially deceptive "advertisements," the California
law covers all "election communication[s]," Cal. Elec. Code § 20012(b)(1), that
contain depictions of state, local *and* federal candidates, election officials, and
elected officials saying or doing something they did not say or do. *Id.*(b)(1)(A)-(C).
California further restricts depictions of "voting machine[s], ballot[s], voting
site[s], [and] other property or equipment related to an election in California,"
*id.*(b)(1)(D), if it is "portrayed in a materially false way." *Id.*(b)(1)(D). Finally, the
required risk of harm in Act 191 is much more specific than in California. Act 191
regulates only MDM distributed in "reckless disregard" of harming a candidate's
electoral prospects or changing voting behavior, HRS § 11-303(a), whereas in
California, it is enough if the content is "reasonably likely" to harm the reputation
or electoral prospects of a candidate or is "reasonably likely to falsely undermine
confidence in the outcome of one or more election contests." Cal. Elec. Code §
20012(b)(1)(B).

scope. Moreover, its inclusion of communications distributed via private messaging services does not make the law any broader than necessary to achieve its intent. That is because "targeted political deepfakes," which are particularly effective at confusing voters, Alvarez Decl. ¶41, can propagate through such channels, "remain[ing] largely invisible to researchers, platform governance teams, and electoral oversight bodies." *Id.* ¶37. This "creates substantial detection and response challenges, as intervention often becomes possible only after significant exposure has occurred." *Id.*

### 2.    Act 191 is not invalid as applied

Satisfying strict scrutiny requires a showing that "a speech restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015). Assuming, *arguendo*, that Act 191 reaches any of Plaintiffs' intended speech, their challenge fails because Act 191 is non-viewpoint discriminatory and, even if the Court applies strict scrutiny, it satisfies that test.

### i.    Act 191 is non-viewpoint discriminatory

Act 191 does not discriminate based on viewpoint so is not "presumptively invalid." Memo at 15. Viewpoint discrimination is when "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). In

other words, it occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

That is not so here. Act 191, *at most*, regulates speech based on its subject matter. Communications can qualify as MDM whether they advocate "for or against" a candidate or ballot measure. And Plaintiffs' complaint that Act 191 restricts speech that "advocates the passage or defeat" of a ballot question "but not content that encourages people not to vote," Memo at 12, is a subject matter distinction, not a viewpoint-based distinction.

Plaintiffs also wrongly assert, without support, that Act 191 allows content that is "positive about a person" but not content that is "derogatory." Memo at 12. Act 191 restricts MDM that is distributed "in reckless disregard of the risk of harming the reputation or electoral prospects of a candidate in an election or changing the voting behavior of voters in an election." HRS § 11-303. That requirement could be met regardless of whether the content distributed is "positive" or "derogatory," so it is not a viewpoint-based distinction.[6]

---

[6] Plaintiffs also complain that Act 191 "draws distinctions based on the speaker," citing the slightly different standards for broadcasters, cable operators, cloud service providers, etc. Memo at 12. But that distinction, which is based on the unique circumstances of those entities, does not "reflect[] a content preference," *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020). It thus has little bearing on the Court's analysis here. In any event, even if the speaker-based distinction in Act 191 reflected a content preference, it would mean only that the Court must apply strict scrutiny, *id.*, which Act 191 survives.

### ii.    Act 191 furthers compelling interests in electoral integrity

In Act 191, the Legislature found, among other things, that "the use of deepfakes or generative AI in elections can be a powerful tool used to spread disinformation and misinformation, which can increase political tensions and result in electoral related conflict and violence." Act 191, Rayner Decl. Ex. A; *see also id*. Ex. C-F (SB2687 committee reports).

Mitigating these harms are compelling interests. *See Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *Burson v. Freeman*, 504 U.S. 191, 199 (1992) ("[A] State has a compelling interest in protecting voters from confusion and undue influence."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 349 (1995) ("The state interest in preventing fraud and libel . . . carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large."). Research confirms these concerns. SCSF ¶17, 18. And the risks outlined by the Hawaiʻi Legislature are not merely hypothetical. SCSF ¶¶9-10.

As the *Bonta* court found, "political deepfakes pose a risk to election integrity," and Hawaiʻi, like California, thus "has a compelling interest in regulating this arena." 2025 WL 2495613, at *4.

### iii.    Act 191 is narrowly tailored

18

"To be narrowly tailored, a statute need not be the least restrictive means of furthering the government's interests, but [it] may not burden substantially more speech than necessary to further the interests." *Menotti v. City of Seattle*, 409 F.3d 1113, 1130–31 (9th Cir. 2005) (cleaned up). And in this context, the restriction need not be "perfectly tailored . . . [because] [l]egislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Burson,* 504 U.S. at 209.

Plaintiffs incorrectly claim that Hawaiʻi has less restrictive alternatives that would further its interests as effectively. A less restrictive alternative must be "at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997). But alternatives to restricting MDM, such as counterspeech, would be far less effective. First, MDM tends to impact viewers' beliefs *even after they learn of its falsity*. SCSF ¶¶14-16. Second, because of how deepfakes become increasingly harder to detect, *id.* ¶7, and how they spread so rapidly, *id.* ¶¶19, 21, it is difficult for governments to identify MDM, particularly in time to mitigate it prior to the harm being done. SCSF ¶28. And third, the role of counterspeech is already built into Act 191 through its disclaimer safe harbor and the fact that MDM is restricted *only*

from February through the general election in election years, when any delay in de-
bunking misinformation would be most harmful. *Id*.

Educational campaigns would also be less effective than Act 191. Even if
people can learn to identify most political deepfakes, and those skills could keep
up with advances in AI technology (which is unlikely), the effects of seeing or
hearing a deepfake often remain even after the viewer understands it is fake. SCSF
¶14. Moreover, the mere existence of MDM creates distrust in the media and the
election process that may be just as problematic as the individual deepfakes
themselves. SCSF ¶18.

Act 191 is as narrow as it can be to achieve its goal, limiting only a "subset
of lies where specific harm is more likely to occur." *Alvarez*, 567 U.S. at 736
(Breyer, J., concurring). It does not reach true satire and parody and targets only
the most problematic type of election falsehoods—those deepfakes which people
are most likely to believe and thus most likely to improperly change voter
behavior. West Decl. ¶40-44.

Plaintiffs assert that Act 191 is both over- and under-inclusive, complaining,
among other things, that it does not apply to MDM depicting celebrities, and that it
exempts "sundry items such as bumper stickers." Memo at 18-19 (quoting HRS §
11-302. But "most problems arise in greater and lesser gradations, and the First
Amendment does not confine a State to addressing evils in [only] their most acute

form." *Williams-Yulee*, 575 U.S. at 454. In any event, fake depictions of non-candidates *could* fall under the law if the communication also *identifies* and advocates for/against the election of a candidate. *See* HRS §§ 11-302; 11-303. There are also justifiable differences between the excluded items Plaintiffs note and those that are covered. Bumper stickers, for example, are not easily shareable through messaging services or social media, which is one of the key drivers in the rapid spread of election misinformation. Alvarez Decl. ¶15. And deepfakes of people that have nothing to do with an election candidate would plainly not be related to Act 191's goals.

Finally, Act 191 protects speech by including a safe harbor provision. Even if a speaker is concerned that a communication falls under Act 191, they can avoid liability entirely by simply including a disclaimer described in HRS § 11-303(c).

### iv.    Act 191's labelling safe harbor is valid

Plaintiffs' claim that Act 191's disclosure provision unconstitutionally compels speech is wrong. "Regulations directed only at disclosure of political speech . . . are subject to exacting scrutiny, which is a somewhat less rigorous judicial review than strict scrutiny." *Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir. 2024) (citation omitted, cleaned up), *cert. denied* (2024). Exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable; that represents not

21

necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* at 1215 (citation omitted).

As an initial matter, Plaintiffs' argument that labelling requirements for MDM are unconstitutional is curious because many of the less restrictive alternatives that Plaintiffs suggest would also require MDM to be labelled, *see* Memo at 16 (suggesting a "committee dedicated to flagging deceptive content"). But even aside from that, Plaintiffs' argument is flawed.

**First**, Act 191 does not apply to true satire. And, although the *Bonta* court found that California's law covered satire and that its safe harbor provision was invalid as applied to satire, *see* 2025 WL 2495613, at *6-7, its findings are entirely distinguishable. The court's conclusions were based on: (1) the specific videos created by the plaintiff that were entered into evidence; (2) California's requirement that "[c]ontent need only 'falsely appear authentic' in some respect to violate the law," *id.* at *6 (quoting Cal. Elec. Code § 20012(f)(8) (ellipsis omitted)); and (3) the California law's explicit requirement that "satire or parody" be accompanied by a disclaimer. 2025 WL 2495613, at *6; Cal. Elec. Code § 20012(b)(3).

None of those bases apply here. First, unlike in *Kohls*, Plaintiffs have not provided evidence that "a reasonable viewer or listener," HRS § 11-303(h)(3), would believe any of their satirical articles were real (even if they were otherwise

22

covered by Act 191). Second, under Act 191, merely "falsely appear[ing]
authentic" is not enough to make content "materially deceptive." And third, unlike
the California law, Act 191 has no blanket requirement that satire and parody be
labelled.

    In any event, Plaintiffs' argument is self-defeating. The only "satire" that Act
191 could possibly apply to—and thus require a disclaimer for—is content that a
reasonable viewer would believe to be true. But as Plaintiffs say, satire requires the
viewer to be in on the joke (even if after initially being caught off-guard). Memo at
14. But with content that reasonable viewers would believe to be real, there is no
joke, at least to the reasonable viewer. Thus, to the extent that there are
circumstances where Act 191 could require a disclaimer for satire, there is very
little risk of any "comedic effect" being hindered.

    **Second**, the labelling of MDM is an effective way to mitigate its harmful
effects on voters and elections, SCSF ¶¶30-31, serving to both "pre-bunk" *and* "de-
bunk" misinformation. *Id.* ¶31. In other words, Act 191's disclaimer requirement is
a "reasonable" response to the problem, and one "whose scope is in proportion to
the interest served." *Smith*, 95 F.4th at 1215.

    **Third**, although Act 191's safe harbor provisions include size and duration
requirements to ensure that they are clear, Plaintiffs exaggerate their intrusiveness.
Nothing in Act 191 requires the disclaimer to cover the image or video being

communicated, or prevents Plaintiffs from modifying the image/video to include space above or below to allow for the disclaimer without being overly intrusive.

## C.    Act 191 is Not Unconstitutionally Vague

A statute is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Snipes*, 786 F.3d at 1187. "Even for regulations of expressive activity, however, 'perfect clarity and precise guidance' are not required," *id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)), and the Court must consider "any limiting construction that a state court or enforcement agency has proffered . . . if [the statute] it is readily susceptible to such a construction." *Id.* at 1188 (citations omitted, cleaned up).

Act 191 gives a person of ordinary intelligence fair notice of what it prohibits. Plaintiffs cannot take provisions completely out of context to assert vagueness.

First, Plaintiffs take issue with Act 191's requirement that MDM be distributed "in reckless disregard" of the risk of harming a candidate's reputation or changing voting behavior. But "scienter requirements alleviate vagueness concerns," not heighten them. *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007). Moreover, the reckless disregard *mens rea*, particularly regarding speech restrictions, is well-established. *See, e.g.*, *Milkovich*, 497 U.S. at 20; *Alvarez*, 567

24

U.S. at 719; *see also United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006) (collecting cases in which scienter requirements like "reasonable cause to believe" and "reasonably should know" have "repeatedly withstood vagueness challenges").

Plaintiffs also fail to read the scienter requirement in context. In particular, only "advertisements," i.e., communications that plainly advocate for or against the election of a specific candidate or issue, are covered. HRS § 11-302. That context brings the Act's scienter requirements even more sharply into focus and, as explained above, essentially moots Plaintiffs' concerns regarding the image referenced in PCSUF ¶22. Memo at 23. Under these provisions, "a person of ordinary intelligence" could easily "base his behavior on his factual knowledge of the situation at hand and thereby avoid violating the law." *Jae Gab Kim*, 449 F.3d at 943.

Second, Plaintiffs challenge the term "digital technology." But the fact that the "statute leaves the term undefined," Memo at 23, does not mean it is vague. *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1440 (9th Cir. 1996). And even without a statutory definition, a person of ordinary intelligence would be put on notice of the conduct within its purview, namely, the use of some kind of data processing device or tool (like a computer or phone) to create MDM.

The hypothetical examples Plaintiffs give again ignore the broader context of the statute. Of course, "[u]sing an iPhone to darken an image" could constitute a use of "digital technology," but that alone would not run afoul of Act 191's myriad other limitations. The fact that "digital technology" could, standing alone, "sweep up vast amounts of protected speech," Memo at 24, is irrelevant. If courts were required to consider only the potential scope of each term in isolation, there would be virtually no regulation that could ever withstand a vagueness challenge.

Finally, Act 191 does not authorize discriminatory enforcement. All that is needed are "minimal guidelines to govern law enforcement." *Gonzales*, 550 U.S. at 150. Given the myriad elements and definitions that must be satisfied under Act 191, as well as the law's scienter requirements, it cannot be said that Act 191 "vests virtually complete discretion in the hands of law enforcement to determine whether" someone is in violation. *Id.* at 150 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). The fact that some of the law's applications might require a court to determine truth or falsity does not make it invalid; indeed, that is a necessity in many types of cases, including fraud and defamation cases. And, the fact that a plaintiff can imagine hypothetical cases in which the meaning of a statute will be in question does not make it unduly vague. *Hill v. Colorado*, 530 U.S. 703, 732-33 (2000).

## V.    CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment and grant

summary judgment for State Defendants.


DATED:  Honolulu, Hawai'i, September 15, 2025.


/s/ Ewan C. Rayner
_____
EWAN C. RAYNER

Attorney for ANNE E. LOPEZ, in her
official capacity as Attorney General of
Hawai'i; DAVID CHEE, in his official
capacity as Chair of the Campaign Spending
Commission; NEAL HERBERT, in his
official capacity as Vice Chairman of the
Campaign Spending Commission; JON
ITOMURA, in his official capacity as
member of the Campaign Spending
Commission; BARBARA POLK, in her
official capacity as member of the Campaign
Spending Commission; and DANTON
WONG, in his official capacity as member
of the Campaign Spending Commission