IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| THE BABYLON BEE, LLC and DAWN O'BRIEN, | CIV. NO. 25-00234 SASP-KJM |
| Plaintiffs, | ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| ANNE E. LOPEZ, in her official capacity as Attorney General of Hawaii; DAVID CHEE, in his official capacity as Chair of the Campaign Spending Commission; NEAL HERBERT, in his official capacity as Vice Chair of the Campaign Spending Commission; JON ITOMURA, in his official capacity as member of the Campaign Spending Commission; BARBARA POLK, in her official capacity as member of the Campaign Spending Commission; DANTON WONG, in his official capacity as member of the Campaign Spending Commission; STEVEN S. ALM, in his official capacity as Prosecuting Attorney for the City and County of Honolulu, | |
| Defendants. | |

**ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.        INTRODUCTION

Plaintiffs The Babylon Bee, LLC ("The Bee"), and Dawn O'Brien ("O'Brien") (collectively "Plaintiffs") are parodists and humorists who create and post digital content about politics on various internet platforms and social media websites. Plaintiffs' content contains admittedly false and hyperbolic information. Plaintiffs maintain that their content constitutes protected political speech and, with respect to The Bee, reflects a "longstanding tradition of

using satire and parody to speak the truth, expose bad ideas, and encourage societal change."

[*See* Dillon Decl., ECF No. 33-1 at PageID.394 (¶ 23).]

To thwart the use of deepfake and generative artificial intelligence ("AI") technologies to influence State elections, Hawaiʻi passed Act 191.[1] Act 191 aims to regulate the distribution of election-based content that is "materially deceptive." Hawaii Revised Statutes ("HRS") § 11-303(a). Act 191 defines "materially deceptive media" as digitally created "advertisement[s]" in the form of "video, image, or audio, that:" "[d]epict[] an individual engaging in speech or conduct in which the depicted individual did not in fact engage" and "[w]ould cause a reasonable viewer or listener to believe that the depicted individual engaged in the speech or conduct depicted." HRS § 11-303(h). The statute includes exemptions for broadcasters and certain service providers and provides a safe harbor provision for materially deceptive media that includes a disclaimer that meets certain content and formatting specifications enumerated in the statute. *See* HRS § 11-303(b)–(c). Act 191 applies "between the first working day of February in every even-numbered year through the next general election" and, accordingly, is set to resume effect starting February 2, 2026. HRS § 11-303(a).

On June 4, 2025, Plaintiffs, who plan to post and share digitally altered election-related content in the upcoming Hawaiʻi election, brought this pre-enforcement action challenging the constitutionality of Act 191 under the First and Fourteenth Amendments, both facially and as applied to their future intended conduct. [*See* Complaint, ECF No. 1 ("Compl.").]

Before this Court are the parties' cross-motions for summary judgment:

(1) Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), filed on August 8, 2025

---

[1] Act 191 of 2024 was codified as part of Hawaii's election law, Hawaii Revised Statutes ("HRS") Chapter 11, at HRS §§ 11-303 and 11-304. For purposes of this Order, the Court's reference to "Act 191" includes HRS § 11-301 through HRS § 11-304.

[P. Mot. for Summary Judgment ("P. MSJ"), ECF No. 32]; and (2) Defendants Anne E. Lopez,

David Chee, Neal Herbert, Jon Itomura, Barbara Polk, and Danton Wong's (collectively "State

Defendants")[2] Motion for Summary Judgment ("State Defendants' MSJ"), filed on

September 15, 2025 [D. Mot. for Summary Judgment ("D. MSJ"), ECF No. 35].[3] Plaintiffs filed

their opposition to State Defendants' MSJ on October 15, 2025 [P. Opp. & Reply, ECF No. 39.],

and State Defendants filed their Reply on October 30, 2025. [D. Reply, ECF No. 43.] On

December 3, 2025, the Court held a hearing on the parties' cross-motions ("December 3, 2025

Hearing") and took the matters under advisement. [*See* ECF No. 46.]

    For the reasons set forth herein, Plaintiffs' MSJ is GRANTED, and State

Defendants' MSJ is DENIED.

## II.        BACKGROUND

### A.        The Plaintiffs

    The Bee is a "satirical news source" that posts satirical news articles,

photographs, and videos on its website (www.babylonbee.com) and various online platforms

which, according to The Bee, "exposes absurdity, mocks foolishness, and highlights hypocrisy in

faith, politics, and culture through satire, humor, and parody." [*See* P. Concise Statement of

Undisputed Facts, ECF No. 33 ("PCSUF") ¶¶ 1, 4–5.] The Bee's website averages more than

twenty million monthly viewers, including ten thousand active monthly users from Hawai'i.

---

[2] State Defendants include the Attorney General of the State of Hawai'i; the Chair, Vice Chair, and members of the State of Hawai'i Campaign Spending Commission; and the Prosecuting Attorney for the City and County of Honolulu. [*See* Compl. ¶¶ 15–26.] All State Defendants appear in their official capacities. [*See id.*]

[3] Defendant Steven S. Alm ("Alm") filed his opposition to Plaintiffs' MSJ on September 15, 2025. [Alm Opp., ECF No. 34.] Alm challenges Plaintiffs' MSJ solely to the extent that Plaintiffs seek attorney's fees against him. [*See id.*]

[Compl. ¶¶ 12, 45; PCSUF ¶ 3.] With respect to The Bee's social media presence, The Bee has nearly five million followers on X, over two million followers on Instagram, over one-and-a-half million followers on Facebook, nearly half a million followers on Rumble, and over one-and-a-half million subscribers on YouTube. [PCSUF ¶ 4.] In addition to posting about national politicians, The Bee also posts about Hawaiʻi politicians and, in doing so, digitally creates images to accompany its satirical news articles. [Compl. ¶¶ 57–61.] For future Hawaiʻi elections, The Bee intends to create and post "digitally created or modified content that is satire or parody, that depicts speech or conduct that did not occur, and that identifies a candidate or ballot issue in an election in Hawaii directly or by implication and advocates support or opposition for that candidate or ballot issue," that is "materially similar" to content The Bee has posted in the past about national politicians and elections. [PCSUF ¶ 7; *see* Dillon Decl., ECF No. 33-1 at PageID.395–98 (¶¶ 35–43).] The Bee admittedly creates content knowing that it is not literally true in all respects. [Compl. ¶ 64; *see* Dillon Decl., ECF No. 33-1 at PageID.398 (¶¶ 45–46).] Despite posting literally false content, The Bee's satirical headlines have later become actual headlines, been mistaken as real news articles, been checked by fact-checking sites for factual accuracy, and been denounced and/or censored for spreading misinformation, conspiracy, and purportedly hateful content. [Compl. ¶¶ 67–90; *see also* PCSUF ¶¶ 9–15; Dillon Decl., ECF No. 35-1 at PageID.398–405 (¶¶ 48–71, 79).]

O'Brien is an individual who creates and posts content about politics, elections, and religion on her public Instagram and Facebook accounts. [PCSUF ¶¶ 17–18).] O'Brien has approximately 7,500 followers on Facebook and 2,700 followers on Instagram. [*Id.* ¶ 17.] O'Brien has posted digitally altered content, including content from The Bee; and has sent digitally altered content via text message and email. [*Id.* ¶¶ 18–19.] O'Brien has previously

criticized Governor Josh Green's ("Governor Green") policies on her social media accounts. [*Id.* ¶ 20.] O'Brien expects Governor Green to run for reelection in 2026 and desires to make posts, including digitally altered posts, from February 2026 through election day, opposing his candidacy. [*Id.* ¶¶ 21–22.] For example, O'Brien desires to make, post, and send content via text message and email, including an AI-generated image of President Donald Trump endorsing Governor Green for reelection; and AI-generated images of Governor Green holding signs that read "Free speech is cancelled" and "Satire and parody require labels." [*Id.* ¶ 22.] In doing so, O'Brien "intends or acts with reckless disregard for the risk that these posts will persuade Hawaii residents not to vote for [Governor] Green." [*Id.* ¶ 24.] O'Brien nonetheless maintains that she will refrain from posting her desired content because she is unwilling to include a disclaimer and/or risk liability under Act 191. [*Id.* ¶ 40.]

### B.    Overview of Act 191

Act 191 aims to regulate election-related content that is "materially deceptive." HRS § 11-303(a); *see* 2024 Haw. Sess. Laws Act 191, § 1–2 at 441–44.[4] In relevant part, Act 191 provides that "no person shall recklessly distribute,[5] or enter into an agreement with another person to distribute, . . . materially deceptive media in reckless disregard of the risk of harming the reputation or electoral prospects of a candidate in an election or changing the voting behavior of voters in an election." HRS § 11-303(a).

Act 191 defines "materially deceptive media" as:

---

[4] According to the Legislature, the purpose of Act 191 is to: "(1) Prohibit a person from recklessly distributing, or entering into an agreement with another person to distribute, materially deceptive media with exceptions; (2) Establish criminal penalties for distributing materially deceptive media; and (3) Establish remedies for parties injured by the distribution of materially deceptive media." 2024 Haw. Sess. Laws Act 191, § 1 at 442.

[5] Act 191 defines "distribute" as "to convey information by any means." HRS § 11-303(h).

any information, including any video, image, or audio, that:

>(1) Is an advertisement;
>
>(2) Depicts an individual engaging in speech or conduct in which the depicted individual did not in fact engage;
>
>(3) Would cause a reasonable viewer or listener to believe that the depicted individual engaged in the speech or conduct depicted; and
>
>(4) Was created by:
>
>>(A) Generative adversarial network techniques or another technique that translates a source image into another image using machine learning, deep learning techniques, and convolutional neural networks;
>>
>>(B) Artificial intelligence; or
>>
>>(C) Digital technology.

HRS § 11-303(h). Moreover, Act 191 defines "advertisement" as:

>any communication, excluding sundry items such as bumper stickers, that:
>
>(1) Identifies a candidate directly or by implication, or identifies an issue or question that will appear on the ballot at the next applicable election; and
>
>(2) Advocates or supports the nomination, opposition, or election of the candidate, or advocates the passage or defeat of the issue or question on the ballot.

HRS § 11-302. These restrictions apply "between the first working day of February in every even-numbered year through the next general election." HRS § 11-303(a).

With respect to penalties, the Attorney General and the Prosecuting Attorney have the authority to initiate criminal prosecutions[6] and civil actions for violations of Act 191; and the

---

[6] Act 191 includes the following criminal penalties:

Campaign Spending Commission has the authority to assess fines, refer for criminal prosecution, and initiate civil actions for violations of Act 191. *See* HRS §§ 11-412(e), 11-303(g), 11-304(b)(1)–(3). Moreover, with respect to civil remedies, the statute permits "[a] depicted individual, including a candidate for election, whose appearance, speech, or conduct is altered or affected through the use of materially deceptive media, or any organization that represents the interest of voters likely to be deceived by the distribution of materially deceptive media" to bring an action for general or special damages. HRS § 11-304(a). The statute also permits actions for injunctive relief against distributors of prohibited content by the enforcing agencies; the depicted individual; a candidate "who is injured or is likely to be injured by dissemination of materially deceptive media"; or "[a]ny organization that represents the interest of voters likely to be deceived by distribution of materially deceptive media." HRS § 11-304(b).

Act 191 also includes carveout exceptions for certain enumerated speakers and/or service providers; and for media that includes a disclaimer that meets certain content and formatting specifications provided for in the statute.[7] HRS § 11-303(b)–(c).

---

(d) Unless otherwise specified in this section, a person who violates this section shall be guilty of a petty misdemeanor.

(e) A person who violates this section within five years of a previous conviction for a violation of this section shall be guilty of a misdemeanor.

(f) A person who violates this section with the intent to cause violence or bodily harm shall be guilty of a class C felony.

(g) The commission may assess a fine for a violation of this section or refer a violation of this section for criminal prosecution under subpart I.

HRS § 11-303(d)–(g).

[7] Specifically, Act 191 includes the following exceptions:

(b) Subsection (a) shall not apply to:

    (1) A broadcaster, cable operator, or direct-to-home satellite provider unless it was involved in the creation of the materially deceptive media; or

    (2) An interactive computer service, cloud service provider, or streaming service for content provided by another person or a developer or provider of any technology used in the creation of materially deceptive media, unless the interactive computer service, cloud service provider, or streaming service has knowledge that the content is deceptive and intends to deceive a resident of the State.

(c) Subsection (a) shall not apply if the media includes a disclaimer informing the viewer that the media has been manipulated by technical means and depicts appearance, speech, or conduct that did not occur; provided that:

    (1) If the media is a video, the disclaimer shall:

        (A) Appear throughout the entirety of the video;

        (B) Be clearly visible to and readable by an observer;

        (C) Be in letters at least as large as the largest size of any text communication; and

        (D) Be in the same language as the language used in the video media;

    (2) If the media is an image, the disclaimer shall:

        (A) Be clearly visible to and readable by the observer;

        (B) Be in letters at least as large as the largest text in the image if the media contains other text; and

        (C) Be in the same language as the language used in the image media;

    (3) If the media consists of only audio and contains no video or image, the disclaimer shall be read:

        (A) At the beginning and end of the media in a clearly spoken manner;

### C.     The Parties' Relevant Summary Judgment Filings

The parties filed cross-motions for summary judgment on whether Act 191 violates the First and Fourteenth Amendments to the United States Constitution. [*See* P. MSJ, ECF No. 32; D. MSJ, ECF No. 35.] Both parties contend that there are no genuine issues of material fact and that they are each entitled to judgment as a matter of law. Plaintiffs seek a permanent injunction prohibiting State Defendants from enforcing Act 191 and a declaration by this Court that Act 191 is unconstitutional. [*See* P. MSJ, ECF No. 32-1 at PageID.377–78.]

Following the December 3, 2025 Hearing on the parties' cross-motions, this Court took the matters under advisement. [*See* ECF No. 46.]

## III.          LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved

---

(B) In a pitch that can be easily heard by the listener; and

(C) In the same language as the audio media; and

(4) If the media was generated by editing or creating new media from an existing video, image, or audio, the media shall include a citation directing the viewer or listener to the original sources from which the unedited version of the existing videos, images, or audios were obtained or generated.

HRS § 11-303(b)–(c).

only by a finder of fact because they may reasonably be resolved in favor of either party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

        The moving party has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted). Once the movant has met this burden, "[a]n opposing party may not defeat summary judgment . . . in the absence of 'any significant probative evidence tending to support ([their] legal theory).'" *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)), *reh'g denied* (9th Cir. 1980). "[A] nonmoving party must go beyond the pleadings and, by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (internal quotation marks omitted) (quoting *Celotex Corp.*, 477 U.S. at 324). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

        The court views the evidence in the light most favorable to the nonmoving party. *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007) (citing *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)). It does not weigh the evidence, but only determines whether there is a genuine issue for trial. *Id.* (citing *Abdul–Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)).

**IV.**        **DISCUSSION**

 **A.**        **Article III Standing**

  As a preliminary matter, the Court addresses State Defendants' threshold challenge to Plaintiffs' standing to bring this pre-enforcement action. [*See* D. MSJ, ECF No. 35-1 at PageID.600–07; *see also* D. Reply, ECF No. 43 at PageID.1012–19.] Challenges to standing may be raised at any time prior to final judgment, and the Court is obligated to address the issue *sua sponte*. *See* Fed. R. Civ. P. 12(h)(1) (providing for waiver of certain defenses but excluding lack of subject matter jurisdiction); *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) ("[T]he jurisdictional issue of standing can be raised at any time."(citation and internal quotation marks omitted)); *San Francisco Drydock, Inc. v. Dalton*, 131 F.3d 776, 778 (9th Cir. 1997) (explaining that courts are obligated to ensure standing exists and to raise it sua sponte "if need be").

  "Article III 'requires a plaintiff to have [1] suffered an injury in fact, [2] by the defendant's conduct, that [3] can be redressed by a favorable result.'" *Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 835 (9th Cir. 2024) (quoting *Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022)). "'Pre-enforcement injury is a special subset of injury-in-fact,' where 'the injury is the anticipated enforcement of the challenged statute in the future.'" *Id.* at 836 (quoting *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024)). "Even though the standing inquiry tilts in favor of standing in these First Amendment pre-enforcement cases, a plaintiff must still show 'an actual or imminent injury to a legally protected interest.'" *Raymond v. Fenumiai*, No. 3:12-cv-00185 JWS, 2013 WL 496194, at *3 (D. Alaska Feb. 8, 2013) (quoting *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010)). "In pre-enforcement cases, the actual or imminent injury is often self-censorship." *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435

F. Supp. 3d 1063, 1082 (E.D. Cal. 2020) (citing *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). "Self-censorship is a constitutionally recognized injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). Accordingly, a pre-enforcement plaintiff can "meet constitutional standing requirements by demonstrating a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Lopez*, 630 F.3d at 786 (citations, brackets, and internal quotation marks omitted).

In assessing the issue of standing in the context of a pre-enforcement challenge, the Ninth Circuit Court of Appeals ("Ninth Circuit") has adopted the United States Supreme Court's ("Supreme Court") three-element framework articulated in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). *See Labrador*, 122 F.4th at 836. "Under *Driehaus*, a plaintiff demonstrates injury-in-fact by showing '[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Driehaus*, 573 U.S. at 159). "Where, as here, plaintiffs bring a pre-enforcement challenge under the First Amendment, unique standing considerations tilt dramatically toward a finding of standing." *Id.* (citations, internal quotation marks, and ellipses omitted). The plaintiff nonetheless bears the burden of establishing that it has standing. *See WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (citation omitted).

Here, State Defendants concede that Plaintiffs have established their *intent* to engage in protected political speech, the first element necessary for pre-enforcement standing under *Driehaus*. [*See* D. Reply, ECF No. 43 at PageID.1013.] Accordingly, this Court's standing analysis turns solely on the latter two *Driehaus* elements, namely, whether (1) Act 191 proscribes

Plaintiffs' intended conduct such that (2) there is a credible threat that Plaintiffs will be

prosecuted under Act 191. For the reasons discussed below, the Court concludes that Plaintiffs

have standing to proceed in this pre-enforcement action.

          *1.    Conduct Arguably Proscribed by Act 191*

        This Court first addresses the second *Driehaus* element: whether Act 191

proscribes Plaintiffs' intended conduct. To demonstrate this element, "[a] plaintiff must only

show that [its] future conduct is *arguably proscribed* by the statute it wishes to challenge."

*American Encore v. Fontes*, 152 F.4th 1097, 1116 (9th Cir. 2025) (emphasis added) (citations,

internal quotation marks, brackets, and ellipses omitted). Further, the Ninth Circuit instructs that,

in assessing the issue of standing, a plaintiff's interpretation of a challenged statute should be

accepted "so long as it is an arguable interpretation." *See id.*

        State Defendants assert that Act 191 does not proscribe Plaintiffs' intended

conduct because the statute (1) does not explicitly prohibit satire or parody and (2) only regulates

"advertisements." [*See* D. MSJ, ECF No. 35-1 at PageID.601–06; *see also* D. Reply, ECF No. 43

at PageID.1015–19.] In support of their latter contention, State Defendants urge this Court to

adopt a narrow construction of the statutory definition of the term "advertisement." [*See* D. MSJ,

ECF No. 35-1 at PageID.601–02.] In response, Plaintiffs maintain that, at the very least, Act 191

arguably proscribes their intended conduct based on the plain language of the statute and that,

accordingly, satire and parody arguably fall under the ambit of Act 191. [*See* P. Opp. & Reply,

ECF No. 39 at PageID.811–16.] This Court agrees with Plaintiffs.

        Here, Plaintiffs provide a reasonable interpretation of Act 191: that it, among

other things, arguably applies to protected political speech that meets certain content

requirements enumerated in the statute. Act 191 provides, in relevant part, that "no person shall

recklessly distribute, or enter into an agreement with another person to distribute . . . materially deceptive media in reckless disregard of the risk of harming the reputation or electoral prospects of a candidate in an election or changing the voting behavior of voters in an election." HRS § 11-303(a). The statute further defines "materially deceptive media" as "any information" that is (1) "an advertisement;" (2) "[d]epicts an individual engaging in speech or conduct in which the depicted individual did not in fact engage;" (3) "[w]ould cause a reasonable viewer or listener to believe that the depicted individual engaged in the speech or conduct depicted;" and (4) was created digitally using one of the methods enumerated in the statute. *Id.* § 11-303(h). "Advertisement" is further defined as "any communication, excluding sundry items such as bumper stickers, that: (1) Identifies a candidate directly or by implication, or identifies an issue or question that will appear on the ballot at the next applicable election; and (2) Advocates or supports the nomination, opposition, or election of the candidate, or advocates the passage or defeat of the issue or question on the ballot." *Id.* § 11-302.

   Plaintiffs have sufficiently shown that Act 191 arguably proscribes their intended conduct. As discussed below, Plaintiffs have each demonstrated and explicitly declared an intent to distribute "materially deceptive media" in reckless disregard of the risk of harming the reputation and/or electoral prospects of a candidate in a Hawaiʻi election or changing the voting behavior of voters in a Hawaiʻi election. [*See* PCSUF ¶¶ 6–7, 22, 24; Dillon Decl., ECF No. 33-1 at PageID.397–98 (¶¶ 40–43); O'Brien Decl., ECF No. 33-2 at PageID.442–45 (¶¶ 24–33).] In doing so, Plaintiffs have each declared an intent to distribute content that arguably meets the statutory definitions of "materially deceptive media" and "advertisement" and have demonstrated

that none of the statute's carveouts apply to their intended conduct.[8] The crux of whether

Plaintiffs' intended conduct is arguably proscribed by the statute turns primarily on the

interpretation and application of the statutory definition of "materially deceptive media." *See*

HRS § 11-303(h). As such, this Court's analysis tracks the four criteria set forth in the statutory

definition of "materially deceptive media," with analytical emphasis on contested criteria. *See id.*

First, Plaintiffs meet the first criterion for "materially deceptive media" by

showing their conduct arguably fails under the statutory definition of "advertisement."[9] *See* HRS

§§ 11-302, 11-303(h). Plaintiffs have each demonstrated and declared an intent to distribute

content that (1) identifies a Hawai'i candidate or an issue or question that will appear on the

ballot at the next applicable Hawai'i election; and (2) would, at least arguably, support the

nomination, opposition, or election of a Hawai'i candidate, or advocate the passage or defeat of

an issue or question on the Hawai'i ballot.[10] *See id.* § 11-302. [*See* PCSUF ¶¶ 6–7, 22, 24; Dillon

---

[8] It is undisputed that neither O'Brien nor The Bee fall into either of the exempt speaker categories; nor do they intend to include a compelled disclaimer in their communications. *See* HRS § 11-303(b)–(c). [*See* Dillon Decl., ECF No. 33-1 at PageID.405–06 (¶¶ 80–86); O'Brien Decl., ECF No. 33-2 at PageID.445–46 (¶¶ 34–40).]

[9] As a preliminary matter, the Court notes that, given that this is a pre-enforcement action and Plaintiffs appear to be without knowledge of the identities of future Hawai'i candidates or ballot issues, this Court will not, as State Defendants urge, hold Plaintiffs to the impossible standard of identifying exact candidates or issues that their intended conduct will include. Instead, under the circumstances presented in this case, the Court finds that Plaintiffs' showing that their intended conduct will be materially similar to past conduct and/or based on informed assumptions that certain candidates or ballot issues will likely appear on the Hawai'i ballot is sufficient to evidence a concrete plan to violate the statute and provides the Court with sufficient information to understand the type of political activity in which they wish to engage. *See Lopez*, 630 F.3d at 787.

[10] The Court rejects State Defendants' contention that to fall under the ambit of Act 191, an advertisement must "*plainly* be an appeal to vote for or against the identified candidate," which according to State Defendants, means that the advertisement must either expressly advocate or be the functional equivalent of express advocacy. [*See* D. MSJ, ECF No. 35-1 at PageID.601–02.] In so arguing, State Defendants rely on *Yamada v. Weaver*, 872 F. Supp. 2d 1023, 1054 (D. Haw. 2012), as persuasive authority for its narrowing construction of the term "advertisement" in

Decl., ECF No. 33-1 at PageID.397–98 (¶¶ 40–43); O'Brien Decl., ECF No. 33-2 at PageID.442–45 (¶¶ 24–33).] For example, O'Brien's intended conduct includes distributing an AI-generated image of President Donald Trump endorsing Governor Green for reelection and AI-generated images of Governor Green holding signs that read "Free speech is cancelled" and "Satire and parody require labels." [PCSUF ¶ 22.] Regardless of the intent behind O'Brien's conduct, such speech would arguably "advocate[] or support[] the nomination, opposition, or election of" Governor Green.[11] Further, The Bee's intended conduct is demonstrated via evidence of past digitally altered content that The Bee has distributed about national candidates, in conjunction with a declared intent to post materially similar content about Hawai'i candidates and/or ballot issues in future Hawai'i elections. [*See* PCSUF ¶¶ 6–7; *see also* Dillon Decl., ECF No. 33-1 at PageID.395–98 (¶¶ 37–43).] Although less explicit than O'Brien's intended conduct, based on this Court's review of the evidence in the record, The Bee's intended conduct would at least arguably "advocate[] or support[] the nomination, opposition, or election" of a future Hawai'i candidate, or advocate the passage or defeat of an issue or question on a future Hawai'i ballot.

---

disputing a vagueness challenge to various definitions in HRS § 11-302. [*See id.*] However, as State Defendants appear to simultaneously concede, the Ninth Circuit ultimately declined to adopt *Weaver*'s narrowing construction, instead, concluding that "Hawaii's advertising definition is sufficiently precise without a limiting construction." *Yamada v. Snipes*, 786 F.3d 1182, 1192 (9th Cir. 2015). [*See* D. MSJ, ECF No. 35-1 at PageID.602 n.1.] This Court also opts to follow the established tenets of statutory interpretation and, in doing so, declines to adopt a narrowing construction of a statute where the plain language is unambiguous. *See United States v. Lillard*, 935 F.3d 827, 833–34 (9th Cir. 2019); *see also CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there."(citation omitted)).

[11] The Court notes that at the December 3, 2025 Hearing, counsel for State Defendants conceded that O'Brien's intended speech "standing alone" and "completely out of any other context" could arguably be considered "advertisements" pursuant to Act 191.

Second, and relatedly, State Defendants do not appear to dispute that Plaintiffs have demonstrated an intent to distribute content depicting speech or conduct that did not occur. *See* HRS § 11-303(h). Plaintiffs openly intend to do so. [*See* PCSUF ¶¶ 7, 22.]

Third, Plaintiffs have demonstrated that their intended conduct "[w]ould cause a reasonable viewer or listener to believe that the depicted individual engaged in the speech or conduct depicted." *See* HRS § 11-303(h). State Defendants assert, among other things, that because The Bee's intended speech is self-classified as satire or parody, it, by definition, cannot be interpreted by a reasonable viewer or listener to be true. [*See* D. MSJ, ECF No. 35-1 at PageID.605–07.] However, as noted previously, despite posting literally false content, The Bee has had satirical headlines later become actual headlines, been mistaken as real news articles, been checked by fact-checking sites for factual accuracy, and been denounced and/or censored for spreading misinformation, conspiracy, and purportedly hateful content. [Compl. ¶¶ 67–90; *see also* PCSUF ¶¶ 9–15; Dillon Decl., ECF No. 35-1 at PageID.398–405 (¶¶ 48–71, 79).] Likewise, O'Brien's intended conduct which features AI-generated images that look remarkably like Governor Green would easily meet the third criterion. Act 191 does not provide any explicit or implicit exception for satire or parody such that those genres of speech could arguably fall under the ambit of the statute, especially where the accompanying imagery has been digitally created or altered to mimic the original.[12]

Finally, the parties do not dispute that Plaintiffs' past and future intended conduct involved and would involve the distribution of content that is digitally created and/or altered

---

[12] As Plaintiffs point out in their briefing, the political deepfake and generative AI content that Act 191 was designed to combat are inclusive of satire and parody, which are genres of speech that draw their power from "proximity to the original." [*See* P. Opp. & Reply, ECF No. 39 at PageID.814–15.]

using one of the methods enumerated in the statute. *See* HRS § 11-303(h). [*See* PCSUF ¶¶ 6–7,
18–19, 22; Dillon Decl., ECF No. 33-1 at PageID.396–98, 405 (¶¶ 38–39, 41–45, 81); O'Brien
Decl., ECF No. 33-2 at PageID.442, 445 (¶¶ 25–26, 32–33).]

Based on the foregoing, the Court concludes that Plaintiffs have sufficiently
demonstrated that their intended conduct is arguably proscribed by Act 191.

### 2. Credible Threat of Enforcement

Next, this Court addresses the third *Driehaus* element: whether there is a credible
threat that Plaintiffs will be prosecuted under Act 191.

> In determining whether a plaintiff has shown a credible or
> substantial threat of enforcement, [the Ninth Circuit has] identified
> a number of factors that may support the reasonableness of a
> plaintiff's fear of prosecution. These include: (1) "whether the
> enforcement authorities have 'communicated a specific warning or
> threat to initiate proceedings,'" [*Tingley*, 47 F.4th at 1067] (citation
> omitted); (2) whether the enforcing authority has disavowed
> enforcement, [*LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–56 (9th Cir.
> 2000)]; and (3) "whether there is a 'history of past prosecution or
> enforcement,'" *Tingley*, 47 F.4th at 1067 (citation omitted).
> Ultimately, the touchstone of our inquiry is whether Plaintiffs have
> adduced enough evidence to show that there is a realistic threat
> that the law in question may be enforced against them.

*Fontes*, 152 F.4th at 1118. As relevant to the present case, the Ninth Circuit has "interpreted the
government's failure to *disavow* enforcement of the law as weighing in favor of standing."
*Tingley*, 47 F.4th at 1068; *see also Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir.
2021) ("Here, the state's refusal to disavow enforcement . . . is strong evidence that the state
intends to enforce the law and that [plaintiffs] face a credible threat."). The Ninth Circuit has also
emphasized that "[i]n evaluating the threat of enforcement, [it] look[s] to the threat posed
*collectively* by the entire universe of potential complainants." *Fontes*, 152 F.4th at 1118 (internal
quotation marks omitted) (quoting *Matsumoto v. Labrador*, 122 F.4th 787, 798 (9th Cir. 2024)).

Here, despite asserting that Act 191 does not proscribe Plaintiffs' intended conduct, State Defendants, which consist of three of the enforcing agencies,[13] have never explicitly disavowed enforcement of Act 191 against Plaintiffs. As noted previously, the Attorney General and the Prosecuting Attorney have the authority to initiate criminal prosecutions and civil actions for violations of Act 191; and the Campaign Spending Commission has the authority to assess fines, refer for criminal prosecution, and initiate civil actions for violations of Act 191. *See* HRS §§ 11-412(e), 11-303(g), 11-304(b)(1)–(3). This Court construes State Defendants' failure to disavow enforcement of Act 191 against Plaintiffs as sufficient to establish a credible threat of prosecution. *See Tingley*, 47 F.4th at 1068.

Moreover, even if State Defendants will not prosecute Plaintiffs, Plaintiffs have still demonstrated a credible threat of adverse action based on the statute's expansive civil remedies provision.[14] Act 191's civil remedies provision provides that "[a] cause of action for

---

[13] As noted above, State Defendants include the Attorney General of the State of Hawai'i; the Chair, Vice Chair, and members of the State of Hawai'i Campaign Spending Commission; and the Prosecuting Attorney for the City and County of Honolulu. [*See* Compl. ¶¶ 15–26.]

[14] The civil remedies provision of Act 191 provides, in relevant part, the following:

(a) A depicted individual, including a candidate for election, whose appearance, speech, or conduct is altered or affected through the use of materially deceptive media, or any organization that represents the interest of voters likely to be deceived by the distribution of materially deceptive media, may bring an action for general or special damages against a person who violates section 11-303.

. . . .

(b) A cause of action for injunctive or other equitable relief may be maintained against any person who is reasonably believed to violate or who is in the course of violating section 11-303 by:

(1) The attorney general;

19

injunctive or other equitable relief may be maintained against any person who is reasonably believed to violate or who is in the course of violating" Act 191, by: (1) any of the three enforcing agencies; (2) "the depicted individual;" (3) "[a] candidate for nomination or election to a public office who is injured or is *likely to be injured* by dissemination of materially deceptive media;" or (4) "[a]ny organization that represents the interest of voters *likely to be deceived* by the distribution of materially deceptive media." HRS § 11-304(b)(1)–(6) (emphases added). Notably, the last two classes of potential complainants are only required by the statute to show that injury or deception was *likely* in order to bring suit, not that they were *actually* injured or deceived. *See id.* § 11-304(b)(5)–(6). As such, the Court finds that the low bar for the latter two classes of complainants significantly expands the universe of potential complainants who could bring suit and, in doing so, presents enough of a collective threat to create a substantial risk of enforcement against Plaintiffs. *See Fontes*, 152 F.4th at 1118–19. Based on the foregoing, the Court concludes that Plaintiffs have adduced enough evidence to show that there is a realistic threat that Act 191 may be enforced against them.

---

          (2) The campaign spending commission;

          (3) A county attorney or county prosecutor;

          (4) The depicted individual;

          (5) A candidate for nomination or election to a public office who is injured or is likely to be injured by dissemination of materially deceptive media; or

          (6) Any organization that represents the interest of voters likely to be deceived by the distribution of materially deceptive media.

HRS § 11-304(a)–(b).

In addition to State Defendants' general challenge to whether there is a credible threat of enforcement against Plaintiffs, State Defendants also make specific enforcement arguments with respect to O'Brien. They assert that O'Brien has failed to establish that a substantial threat of enforcement exists against her because O'Brien admits that she will refrain from posting certain content (*i.e.*, self-censor) in fear of prosecution under Act 191. [*See* D. MSJ, ECF No. 35-1 at PageID.607.] In plainer terms, State Defendants appear to assert that O'Brien's intended self-censorship precludes any credible threat of enforcement against her. [*See id.*] This Court disagrees.

As noted previously, "[i]n pre-enforcement cases, the actual or imminent injury is often self-censorship." *Stavrianoudakis*, 435 F. Supp. 3d at 1082 (citing *Bayless*, 320 F.3d at 1006). That is because, "[i]n an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Bayless*, 320 F.3d at 1006 (citations omitted). This Court nonetheless acknowledges that "[t]he self-censorship door to standing does not open for every plaintiff." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). Instead, "[t]he potential plaintiff must have an actual and well-founded fear that the law will be enforced against [them]." *Id.* (citation and internal quotation marks omitted). Moreover, "[i]n the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Id.* (citations omitted).

Here, rather than a generalized threat of chilled speech, O'Brien has provided the Court with detailed examples of the conduct she desires to engage in; has asserted how her intended conduct arguably falls within Act 191's reach; and has asserted an intent to self-censor

rather than risk a credible threat of enforcement under the statute. *See supra* Sections II.A (describing O'Brien's intended conduct and intent to self-censor); IV.A.1–2 (finding that Act 191 arguably proscribes O'Brien's intended conduct, regardless of her intent to self-sensor). Based on the circumstances presented in this case, the Court finds that O'Brien has a reasonable and well-founded fear that Act 191 would be enforced against her, and as such, the self-censorship door to standing opens for her.[15]

### B.    First Amendment Claim

Having determined that Plaintiffs have standing to proceed with this pre-enforcement action, the Court next addresses the merits of the parties' cross-motions for summary judgment. Plaintiffs raise both facial and as-applied First Amendment challenges to Act 191. The Court addresses each in turn, below.

####    1.    *First Amendment Facial Challenge*

####    a.    *Act 191 discriminates, at minimum, based on content and speaker.*

Plaintiffs bring a facial attack against Act 191, arguing that the statute is unconstitutional because it restricts protected political speech and, in doing so, discriminates based on content, viewpoint, and speaker; and it compels speech. [*See* P. MSJ, ECF No. 32-1 at PageID.359–67; P. Opp. & Reply, ECF No. 39 at PageID.817–19.] In response, State Defendants maintain that Act 191 is non-viewpoint discriminatory because it does not target views taken by speakers, but they concede that "Act 191, at most, regulates speech based on its subject matter" (*i.e.*, content about candidates and ballot issues) and includes speaker-based "distinctions."

---

[15] State Defendants do not appear to challenge the third *Driehaus* element with respect to The Bee. [*See* D. MSJ, ECF No. 35-1 at PageID.607.] The Court nonetheless concludes that for the same reasons that the self-censorship door opens for O'Brien, it also opens for The Bee. *See supra* Sections II.A (describing The Bee's intended conduct); IV.A.1 (finding that Act 191 arguably proscribes The Bee's intended conduct).

[D. MSJ, ECF No. 35-1 at PageID.612–13, 613 n.6.] Upon review of the record in conjunction with the relevant legal authorities, the Court finds that Act 191 discriminates based on content and speaker and, in doing so, restricts constitutionally protected political speech, making Act 191 presumptively invalid and subject to strict scrutiny.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). Accordingly, a government cannot "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). "In evaluating whether a regulation violates the First Amendment, courts 'distinguish between content-based and content-neutral regulations of speech.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (quoting *Vidal v. Elster*, 602 U.S. 286, 292 (2024)). The Supreme Court has emphasized that "the crucial first step in the content-neutrality analysis" involves "determining whether the law is content neutral on its face." *Reed*, 576 U.S. at 165. "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 163). As a general matter, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

Here, Act 191 facially regulates protected political speech based on its content. Act 191 prohibits the distribution of "materially deceptive media in reckless disregard of the risk of harming the reputation or electoral prospects of a candidate in an election or changing the voting behavior of voters in an election." HRS § 11-303(a). The statute specifically applies to "any communication" that "[i]dentifies a candidate directly or by implication, or identifies an issue or question that will appear on the ballot at the next applicable election" and that "[a]dvocates or supports the nomination, opposition, or election of the candidate, or advocates the passage or defeat of the issue or question on the ballot." HRS § 11-302. As State Defendants concede, Act 191 regulates speech based on its subject matter (*i.e.*, the topic discussed) and, in doing so, facially regulates speech based on content. *See Reed*, 576 U.S. at 163.

Further, Act 191's purported "safe harbor" provision, which compels the inclusion of a disclaimer meeting certain statutorily prescribed content and formatting specifications in exchange for exemption, also constitutes content-based regulation—particularly in its application to compelled non-commercial speech. *See* HRS § 11-303(c); *X Corp.*, 116 F.4th at 900, 902 ("When a state 'compel[s] individuals to speak a particular message,' the state 'alter[s] the content of their speech,' and engages in content-based regulation" such that, "[e]ven a pure 'transparency' measure, if it compels non-commercial speech, is subject to strict scrutiny" (citations omitted)). As Plaintiffs point out, Act 191's compelled disclaimer would impermissibly alter the content, intended effect, and message of their speech. [*See* P. MSJ, ECF No. 32-1 at PageID.366–67.] Or "[p]ut simply, a mandatory disclaimer for parody or satire would kill the joke." *Kohls v. Bonta*, 797 F. Supp. 3d 1177, 1189 (E.D. Cal. 2025).

As well as content-based discrimination, Act 191 also discriminates based on speaker. Act 191 includes carveouts for broadcasters, cable operators, direct-to-home satellite

providers, and other service providers that meet certain criteria. *See* HRS § 11-303(b)(1)–(2). Based on Act 191's exemption provision, Act 191 imposes different obligations on different speakers depending on who they are and their degree of knowledge and/or separation from the materially deceptive media.[16] *See id.*

What is more, none of the relevant historical exceptions to the First Amendment appear to save Act 191. *See United States v. Alvarez*, 567 U.S. 709, 717–22 (2012) (plurality opinion). As a practical matter, the Supreme Court has "reject[ed] the notion that false speech should be in a general category that is presumptively unprotected." *Id.* at 722. Instead, it has permitted restrictions on the content of speech in a "few historic and traditional categories [of expression] long familiar to the bar." *Id.* at 717 (internal quotation marks omitted) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Among these categories of unprotected speech are defamation and fraud. *See id.* However, unlike defamation and fraud—which typically require a showing of actual or tangible harm, Act 191 goes further to prohibit the distribution of materially deceptive media "in reckless disregard of *the risk of harming* the reputation or electoral prospects of a candidate in an election[.]" *See* HRS § 11-303(a) (emphasis

---

[16] This Court notes that Act 191 does not appear to be viewpoint discriminatory on its face; however, it is likely to be viewpoint discriminatory in effect via the threat of subjective and discriminatory enforcement. Based on its language, Act 191 applies to content that could potentially harm a candidate's reputation or electoral prospects, *or*, more broadly, to content that could change voting behavior. HRS § 11-303(a). Moreover, as evidenced by the statutory definition of "advertisement," Act 191 applies to advocacy that is supportive of *or* oppositional to a candidate or ballot issue. *See id.* § 11-302. Based on the breadth of speech that Act 191 captures, as a practical matter, it is unlikely that a civil action would be brought by a candidate under Act 191 where the outcome favors the candidate. In simpler terms, nobody will sue in situations where voting behavior or electoral prospects are changed in his or her favor. Thus, while Act 191 appears to extend to the spectrum of helpful *and* hurtful content, it will likely only be enforced against the latter, apparently making enforcement of Act 191 viewpoint discriminatory in effect. *See infra* Section IV.C.

added). By its plain language, Act 191 extends beyond those traditional categories of expression, requiring only a speculative and unquantifiable "risk" of harm.

          *b.*     *Act 191 fails strict scrutiny.*

Having determined that Act 191 is presumptively invalid because it facially discriminates based on content and speaker, the Court proceeds to a strict scrutiny analysis. *See Reed*, 576 U.S. at 163–64. "To satisfy strict scrutiny, a restriction on speech is justified only if the government demonstrates that it is narrowly tailored to serve a compelling state interest." *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023) (citing *Reed*, 576 U.S. at 163).

          *i.*     *Hawaiʻi has a compelling interest.*

Plaintiffs argue that Act 191 does not further a compelling interest because its selective limitations on speech fail to protect the integrity of Hawaiʻi elections, and it is both under and overinclusive. [*See* P. MSJ, ECF No. 32-1 at PageID.370–73.] In response, State Defendants argue that the deepfake and generative AI content that Act 191 seeks to prohibit poses a risk to Hawaii's interests in electoral integrity via the spread of disinformation and misinformation. [*See* D. MSJ, ECF No. 35-1 at PageID.614.] This Court agrees that Hawaii's interests in electoral integrity are compelling.

The Supreme Court has emphasized that "[a] State undisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (citation omitted). And that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). As such, "a State has a compelling interest in protecting voters from confusion and undue influence." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (citing *Eu*, 489 U.S. at 228–29).

Here, in enacting Act 191, the Legislature found that "the use of deepfakes or generative AI in elections can be a powerful tool used to spread disinformation and misinformation, which can increase political tensions and result in electoral-related conflict and violence." [Exh. A, ECF No. 36-3 at PageID.650; *see* Rayner Decl., ECF No. 36-2 at PageID.645–46.] Based on the foregoing concerns, the Legislature concluded "that regulating the use of deepfake and generative AI technologies to influence elections is necessary to protect the democratic process in the State." [*Id.*]

While the record does not indicate whether the Legislature considered examples of deepfake or generative AI content that have impacted the integrity of State elections in Hawaiʻi or elsewhere, research and studies may nonetheless support some of the Legislature's concerns regarding potential impacts to democratic processes.[17] [*See* Alvarez Decl., ECF No. 36-14 at PageID.708–11 (¶¶ 17–22); *see also* West Decl., ECF No. 36-16 at PageID.785–89 (¶¶ 31–37).] For example, according to State Defendants' experts, "[s]tudies have shown that deepfakes can impact trust in news on social media[;] [t]hey can weaken democratic norms and functions[;] [a]nd they can lead to dismissing real evidence." (Footnotes omitted.) [West Decl., ECF No. 36-16 at PageID.786 (¶ 32).] "Research has [also] shown that [political deepfakes] can be used to generate uncertainty or ambiguity in the minds of viewers, thus producing confusion[,] which, among other things, "may influence political behavior, ranging from making voters less likely to turn out in elections to affecting who they may vote for in an election." [Alvarez Decl., ECF No. 36-14 at PageID.736 (¶ 67).] Based on the evidence in the record, the

---

[17] Though, the Court notes that the Legislature's findings regarding the linkage between "electoral related conflict and violence" and political deepfakes and generative AI technologies do not appear to be explicitly supported and/or confirmed by studies or research that are in the record before this Court. [*See* Alvarez Decl., ECF No. 36-14 at PageID.712 (¶ 25).]

Court finds that Hawaiʻi has a compelling interest in regulating political deepfakes for the purpose of protecting the State's electoral integrity—an essential democratic function.

ii.    *Act 191 fails narrow tailoring.*

Having determined that Hawaiʻi has a compelling interest, Plaintiffs' facial challenge hinges on the narrow-tailoring prong of the strict scrutiny framework. Plaintiffs argue that Act 191 flunks narrow tailoring because Hawaiʻi has less restrictive alternatives at its disposal that would be as effective as Act 191 without infringing on speech. [*See* P. MSJ, ECF No. 32-1 at PageID.368–70; *see also* P. Opp. & Reply, ECF No. 39 at PageID.819–22.] In response, State Defendants maintain that Act 191 is narrowly tailored to the State's interests in safeguarding Hawaiʻi elections, and any less restrictive alternatives would be "far less effective." [*See* D. MSJ, ECF No. 35-1 at PageID.615–17; *see also* D. Reply, ECF No. 43 at PageID.1022–24.] Upon review, the Court finds that State Defendants have failed to use the least restrictive means to combat the purported effects of political deepfakes and generative AI technologies on Hawaiʻi elections, or in the alternative, have failed to demonstrate that existing laws are insufficient to deal with those issues, "before resorting to the drastic step of restricting speech." *See IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125–26 (9th Cir. 2020).

To be narrowly tailored, a "curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (citation omitted); *see also IMDb.com, Inc.*, 962 F.3d at 1125 ("Even if a state intends to advance a compelling government interest, we will not permit speech-restrictive measures when the state may remedy the problem by implementing or enforcing laws that do not infringe on speech." (citations omitted)).

"[B]ecause restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th Cir. 2013) (citations omitted).

Here, State Defendants do not contest that less restrictive, speech-neutral alternatives exist, only that such alternatives would be "less effective" than Act 191. The legislative history of Act 191 does not indicate whether the Legislature considered less restrictive alternatives in enacting Act 191. [*See* Rayner Decl., ECF No. 36-2 at PageID.645–46; Exhs. A, C–F, ECF Nos. 36-3, 36-5–36-8.] Instead, the parties rely, in large part, on evidence in the form of vying expert declarations to support their respective positions. Both parties' experts identify counter speech and increased digital and political literacy as potential alternatives to mitigating the impacts of political deepfakes, with differing takes on their efficacy.

With respect to counter speech as a less restrictive alternative, Plaintiffs argue that Hawaiʻi "could counter deceptive speech with factual speech of its own," or it could start a government database or committee dedicated to tracking and flagging materially deceptive content. [*See* P. MSJ, ECF No. 32-1 at PageID.369.] The parties' experts offer competing opinions with respect to the efficacy of counter speech as a solution. While State Defendants' expert explains that political deepfakes are "sticky," "highly realistic," and can spread too quickly for counter speech to be effective post-dissemination [*see* Alvarez Decl., ECF No. 36-14 at PageID.716, 719–20, 723–24, 729–30 (¶¶ 30, 36, 42, 53–54)], Plaintiffs' expert counters that "the arguments made against political deepfakes (that they are convincing, are sticky, and spread quickly) also apply to written misinformation," making political deepfakes nonunique from other forms of misinformation, and that studies indicate that counter speech in the form of "crowd-sourced fact checking[,] reduces engagement with and diffusion of misinformation and can help

identify misinformation at scale." [*See* Lucas Decl., ECF No. 41-4 at PageID.972, 976–78 (¶¶ 8, 16, 19).] Despite the competing evidence, this Court finds that targeted counter speech appears to be a viable, less restrictive alternative to Act 191 because it serves Hawaii's purpose and would not be overinclusive.

        Next, with respect to increased electoral literacy as a less restrictive alternative, Plaintiffs argue that Hawaiʻi could launch educational campaigns on how to spot deceptive political content. [*See* P. MSJ, ECF No. 32-1 at PageID.369.] The parties' experts appear to agree that such an alternative would be effective at mitigating the effects of political deepfakes. According to Plaintiffs' expert, "[r]esearch suggests that promoting digital and media literacy, as well as increasing political knowledge, will likely be *more effective* than bans in mitigating the harms associated with false information spread through political deepfakes." (Emphasis added.) [Lucas Decl., ECF No. 41-4 at PageID.973–74 (¶ 10.c).] Despite State Defendants' contention that educational campaigns would be "less effective" than Act 191 due to the nature of political deepfakes, State Defendants' expert agrees that "with strengthened media literacy skills and greater political sophistication, people can be more likely to identify political deepfakes and less likely to believe that they are accurate." [Alvarez Decl., ECF No. 36-14 at PageID.730 (¶ 55).] State Defendants' expert's only reservation with increased literacy as a viable alternative appears to be that developing such skills in the electorate "would require a larger investment of resources" compared to a ban. [*Id.*] Such a reason has been rejected by the Supreme Court for it has made clear that "[t]he First Amendment does not permit the State to sacrifice speech for efficiency." *Nat'l Inst. of Family & Life Advocates*, 585 U.S. at 775 (citations omitted). Thus, State Defendants have failed to demonstrate that increasing the digital and political literacy of the electorate through educational campaigns would be less effective than Act 191.

In addition to the less restrictive alternatives identified by the parties' experts, Plaintiffs argue that Hawai'i also has existing laws that it could enforce to protect electoral integrity, or alternatively, that Act 191 could be amended to limit potential plaintiffs to candidates actually harmed by unprotected false speech, thereby more closely mirroring defamation law. [*See* P. MSJ, ECF No. 32-1 at PageID.369–70.] With respect to the former alternative, Plaintiffs assert that Hawaii's election fraud law, HRS § 19-3, for example, already regulates the knowing publication and/or distribution of false information about the "withdrawal of a candidate at the election" or "about the time, date, place, or means of voting." HRS § 19-3(6), (12). Plaintiffs also argue that Hawai'i has additional existing statutory causes of action—such as privacy torts, copyright infringement, or defamation—that already address some of the alleged harms that materially deceptive media pose. State Defendants' briefing is not directly responsive to these arguments. They, however, concede elsewhere that "much of what Act 191 restricts would also constitute unprotected defamation," which would, in this Court's view, conceivably be covered by the State's existing defamation laws. [*See* D. MSJ, ECF No. 35-1 at PageID.610.] Because State Defendants have introduced no evidence addressing this issue, the Court finds that they have failed to demonstrate that existing laws are insufficient to deal with the purported risk of political deepfakes and generative AI technologies on the integrity of Hawai'i elections. *See IMDb.com, Inc.*, 962 F.3d at 1125–26 (explaining that the State of California offered "little argument" or evidence to show why its existing laws were insufficient and, in doing so, failed to show that the challenged State law was the least restrictive means to protect its compelling interest (citation omitted)); *see also Valle Del Sol Inc.*, 709 F.3d at 827 ("Nothing in the record shows that Arizona could not effectively pursue its interest in traffic safety by enforcing or enacting similar kinds of speech-neutral traffic safety regulations.").

Altogether, this Court concludes that Act 191 fails narrow tailoring.

       c.     *Act 191's unconstitutional applications outweigh its constitutional ones.*

Alternatively, and/or in conjunction with their facial challenge to Act 191, Plaintiffs assert that Act 191 is overbroad in relation to any legitimate sweep and is facially unconstitutional for that additional reason, citing to the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). [*See* P. MSJ, ECF No. 32-1 at PageID.373–75.] In any event, Plaintiffs argue, a *Moody* analysis is obsolete in this case, where the statute has already been deemed facially discriminatory such that it raises the same First Amendment issues in every application. [*See* P. Opp. & Reply, ECF No. 39 at PageID.817–18.] State Defendants counter that the test set forth in *Moody* is the only analysis relevant to Plaintiffs' facial challenge. [*See* D. MSJ, ECF No. 35-1 at PageID.608–12; *see also* D. Reply, ECF No. 43 at PageID.1020.] And, in so arguing, State Defendants maintain that Act 191 contains important limitations to its scope and is salvageable regardless of its lack of content neutrality because its constitutional applications outweigh any potential unconstitutional ones. [*See* D. MSJ, ECF No. 35-1 at PageID.608–12.] This Court has already determined that Act 191 is facially discriminatory and presumptively unconstitutional such that each application presumably creates the same First Amendment implications, regardless of overbreadth. Nonetheless, the Court also finds that Act 191 is substantially overbroad.[18]

---

[18] While the case law is clear that an overbreadth analysis is noncompulsory where a facially challenged statute has been deemed viewpoint discriminatory, it is less clear with respect to instances where a statute has been deemed facially discriminatory based on content and speaker. *See, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019) (rejecting the government's request to uphold a challenged statute "against facial attack because its unconstitutional applications are not 'substantial' relative to 'the statute's plainly legitimate sweep'" and explaining that the Supreme Court "has never applied that kind of analysis to a viewpoint-discriminatory law" (citations omitted)). Thus, despite having already found that Act 191 is facially discriminatory and fails strict scrutiny, the Court also conducts an analysis under *Moody*, in an abundance of caution. The

The Supreme Court has established that in First Amendment facial challenge cases, "[t]he question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). Accordingly, "even a law with 'a plainly legitimate sweep' may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723–24. As set forth in *Moody*, there are two steps in assessing a First Amendment facial challenge: (1) "[t]he first step . . . is to assess the state laws' scope. What activities, by what actors, do the laws prohibit or otherwise regulate?"; and (2) the second step "is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 724–25. With respect to the second step, *Moody* instructs courts to "explore the laws' full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Id.* at 726.

Here, with respect to scope, Plaintiffs argue that Act 191 regulates a substantial amount of speech by facially regulating images, videos, and audio about proscribed topics. [P. MSJ, ECF No. 32-1 at PageID.374.] Accordingly, every application of Act 191 regulates speech, rather than non-expressive conduct. [*Id.*] Further, Plaintiffs assert that Act 191 is sprinkled with undefined and/or expansive standards that balloon its scope. [*See* P. MSJ, ECF No. 32-1 at PageID.374–77.] This Court agrees.

First, Act 191 applies to "any information, including any video, image, or audio, that: . . . [w]as created by . . . [d]igital technology." HRS § 11-303(h). Unlike "artificial

---

Court's analysis of this issue, however, is purposefully limited to the arguments raised by the parties.

intelligence," "digital technology" is not statutorily defined. And, as Plaintiffs point out, modifications by "digital technology" are sweeping and "could encompass any alteration of an image, no matter how minor." [*See* P. MSJ, ECF No. 32-1 at PageID.376.] Second, Act 191 extends to the distribution of prohibited content "by any means." HRS § 11-303(h). At the December 3, 2025 Hearing, counsel for State Defendants conceded that Act 191 broadly extends to content shared via private social media and direct message, even if viewed by only one person. Lending to the statute's overbreadth, Act 191 could apply to prohibited content sent by an individual via direct message to a single person who may or may not vote in an upcoming Hawaiʻi election, as long as the enforcing agency or complainant can show that the content was distributed "in reckless disregard of *the risk of harming* the reputation or electoral prospects of a candidate"—an amorphous, subjective standard.[19] *See* HRS § 11-303(a) (emphasis added). Third, and relatedly, Act 191's broad definition of "advertisement" makes the statute applicable to both commercial and non-commercial speech, regardless of its reach or audience. *See id.* § 11-302. The breadth of Act 191's scope is palpable.

Turning to the second step in a First Amendment facial challenge, with respect to Act 191's applications, Plaintiffs maintain that the law sweeps up large swaths of protected speech—including political satire, parody, commentary, and content that merely references a candidate "by implication"—making a substantial number of its applications unconstitutional, in relation to its plainly legitimate sweep. [*See* P. MSJ, ECF No. 32-1 at PageID.374.] "Political speech, of course, is 'at the core of what the First Amendment is designed to protect.'" *Morse v.*

---

[19] Contrary to State Defendants' contention otherwise, Act 191's "scienter requirement" does not limit the statute's scope. [*See* D. MSJ, ECF No. 35-1 at PageID.609.] Instead, as discussed in Section IV.C. below, Act 191's scienter requirement unconstitutionally clouds the statute's central prohibition provision.

*Frederick*, 551 U.S. 393, 403 (2007) (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003) (plurality opinion)). Thus, while this Court recognizes that Act 191 "has constitutional applications to the extent that defamatory or fraudulent speech falls under its umbrella, this is only because its scope is so elastic that it penalizes wholesale categories of speech, sweeping in both protected and unprotected speech." *Kohls v. Bonta*, 797 F. Supp. 3d at 1187–88. Based on the foregoing, and considering the statute's scope, this Court concludes that Act 191's potential unconstitutional applications would consistently outweigh its constitutional ones.

       2.     *First Amendment As-Applied Challenge*

      Together with their facial challenge, Plaintiffs bring an as-applied challenge to Act 191. The parties assert largely the same arguments as those raised with respect to Plaintiffs' facial challenge.

      "An as-applied First Amendment challenge contends that a given statute or regulation is unconstitutional as it has been applied to a litigant's particular speech activity." *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) (citation omitted). "The underlying constitutional standard, however, is not different then in a facial challenge." *Id.* (citation omitted); *see also Brooklyn Legal Servs. Corp v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006) ("Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated . . . Invariant, however, is the *substantive rule of law* to be used. In other words, *how* one must demonstrate the statute's invalidity remains the same for both types of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." (citation omitted)), *abrogated on other grounds by*, *Bond v. United States*, 564 U.S. 211 (2011).

As discussed extensively in the preceding sections, the Court has already determined that Act 191 arguably proscribes Plaintiffs' intended conduct, that Plaintiffs face a credible threat of enforcement, and that Act 191 is facially unconstitutional and overbroad. Thus, under the same constitutional principles, and for the same reasons that Act 191 is facially invalid, the Court finds that the statute is also invalid as applied to Plaintiffs' intended conduct. Given that the Court has discussed the relevant facts and engaged in the applicable legal analyses in the preceding sections, it will not repeat the same here for the sake of brevity and efficiency.

### C.    Fourteenth Amendment Claim

Finally, having determined that Plaintiffs prevail on their First Amendment summary judgment claim, the Court addresses Plaintiffs' void-for-vagueness challenge under the Due Process Clause of the Fourteenth Amendment. Plaintiffs assert that Act 191 is unconstitutionally vague because, among other things, it employs ambiguous and subjective standards that fail to provide clear notice of what conduct is prohibited, and it "give[s] officials unbridled enforcement discretion." [*See* P. MSJ, ECF No. 32-1 at PageID.373, 376.] This Court agrees that Act 191 is imbued with imprecision and ambiguity, rendering the statute unconstitutionally vague under the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citations omitted). "[T]he void-for-vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them

so they may act accordingly; second, precision and guidance are necessary so that those

enforcing the law do not act in an arbitrary or discriminatory way." *Fed. Commc'n Comm'n v.*

*Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Where First Amendment freedoms are

involved, "rigorous adherence to those requirements is necessary to ensure that ambiguity does

not chill protected speech." *Id.* at 253–54.

Even for regulations of expressive activity, "perfect clarity and precise guidance

have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Nonetheless, "vagueness concerns are more acute when a law implicates First Amendment

rights" because of the risks of chilled speech and discriminatory enforcement, "and therefore,

vagueness scrutiny is more stringent." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022)

(citations and internal quotation marks omitted). Further, as the Ninth Circuit has explained,

given the significance of constitutionally protected political speech, courts must "proceed with

vigilance when evaluating a vagueness challenge involving laws that regulate political speech—

speech that is entitled to the 'broadest protection.'" *Id.* (citation omitted).

Here, the central prohibition provision of Act 191 imposes an especially

subjective and vague standard. At its core, Act 191 prohibits the distribution of "materially

deceptive media in reckless disregard of *the risk of harming* the reputation or electoral prospects

of a candidate in an election or changing the voting behavior of voters in an election." HRS

§ 11-303(a) (emphasis added). The consequences of imposing a vague standard are two-fold.

First, Act 191's "reckless disregard of the risk of harming" or "changing" standard muddies the

line between compliance and noncompliance by forcing speakers to base their conduct on their

own risk assessment, rather than on clear, objective standards. Second, Act 191 introduces an

inherently subjective assessment for enforcement agencies. Rather than require actual harm,

Act 191 imposes a risk assessment based solely on the value judgments and biases of the

enforcement agency—which could conceivably lead to discretionary and targeted enforcement

that discriminates based on viewpoint. *See Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015)

("A statute is impermissibly vague if it . . . is so indefinite as to allow arbitrary and

discriminatory enforcement." (citation and internal quotation marks omitted)). In this case, the

ultimate consequence of indeterminate compliance lines and the risk of discriminatory

enforcement is a chilling effect on First Amendment speech. *See Fed. Commc'n Comm'n*, 567

U.S. at 253–54.

Thus, based on the foregoing, in addition to the various vague and/or undefined

standards in Act 191 discussed above in Section IV.B.1.c, this Court concludes that Act 191 is

unconstitutionally vague pursuant to the Fourteenth Amendment.

## V.        CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment [ECF

No. 32] is hereby **GRANTED**. By extension, State Defendants' Motion for Summary Judgment

[ECF No. 35] is hereby **DENIED**. State Defendants are PERMANENTLY ENJOINED from

enforcing Act 191.

IT IS SO ORDERED.

DATED: Honolulu, Hawaiʻi, January 30, 2026.



Shanlyn A.S. Park
United States District Judge

*The Babylon Bee, LLC and Dawn O'Brien vs. Anne E. Lopez, in her official capacity as Attorney General of Hawaii, et al.*; Civ. No. 25-00234 SASP-KJM; ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT